LITTLEJOHN & CO. ET AL. *v.* UNITED STATES (No. 1953).[1]

PAPRIKA—CAPSICUM OR RED PEPPER.

Paprika is a capsicum or red pepper.—Vandegrift & Co. *v.* United States (8 Ct. Cust. Appls., 1; T. D. 37121). The evidence as to a contrary commercial designation being insufficient, the decision of the Board of United States General Appraisers so classifying it under paragraph 235, tariff act of 1913, is affirmed.

[1] T. D. 38045 (36 Treas. Dec., 493).

United States Court of Customs Appeals, June 3, 1919.

APPEAL from Board of United States General Appraisers, G. A. 8205 (T. D. 37805).

[Affirmed.]

Comstock & Washburn (Walter Evans Hampton and J. Stuart Tompkins) for appellants.

Bert Hanson, Assistant Attorney General (Samuel Isenschmid, special attorney, of counsel), for the United States.

[Oral argument Apr. 21, 1919, by Mr. Tompkins and Mr. Isenschmid.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

These importations were assessed under paragraph 235, which provides, among other things, for "* * * pepper, black or white; capsicum or red pepper, or cayenne pepper; and clove stems, 1 cent per pound; * * * ground spices, in each case, the specific duty per pound enumerated in the foregoing part of this paragraph for unground spices, and in addition thereto a duty of 20 per centum ad valorem; * * *."

The assessment was made on the basis that these were dutiable at the full rate of 1 cent per pound and 20 per cent ad valorem, while the importers claim that paprika is not a red pepper within the meaning of the provision, or at least is not so known to the trade.

A similar question was presented and fully discussed in an opinion by Barber, Judge, in Vandegrift & Co. v. United States (8 Ct. Cust. Appls., 1; T. D. 37121). In that case the court overruled the contention of the importers on the record as presented, saying, however, in the course of the opinion:

We are not unmindful that wholesalers *might* among themselves exclude paprika from the term "red pepper." But the common employment of that term by them in the retail trade, with no further explanation therefor than what has been given, suggests to us that they use it in the wholesale trade also and is consistent therewith. At any rate, it tends to so far weaken the proof of commercial designation that we decline to be persuaded on the whole record that such designation has been established, as claimed by the importers.

It was further said, after discussing the subject of legislative adoption of previous rulings:

While this may not preclude importers from establishing a commercial designation that warrants a different classification, we think in the present case the attempt to do so has failed.

The importers have made a fuller record—that is to say, they have called more witnesses who have testified that paprika would be excluded from the term "red pepper" in wholesale dealings.

The case, in all its phases, has been given a careful examination, the evident confidence of the importers' counsel and the able presentation which he has given of the case having fully merited such

attention. It would not be profitable, however, to repeat the discussion which was had in the Vandegrift case. As to the questions which were there decided, it will suffice to say that upon full consideration of the arguments presented by counsel, we are not induced to reopen the questions which were there fully considered, nor are we satisfied that any error was committed in reaching the conclusion that the court there pronounced.

The single question, therefore, left in the case is that of commercial designation. In the former case testimony very similar to that which is presented in this record was adduced. In fact, both records are before us, the Vandegrift record having been received on the trial.

The effort has been to show that the Spanish paprika is not a red pepper commercially; that it is such botanically and in common speech seems not to be denied. But the claims are twofold: First, that in its uses it is chiefly used by sausage makers and catsup makers for coloring purposes. As to this we are satisfied that while it may be used for that purpose, the use of the material in making catsup is for the double purpose of obtaining a certain flavor and for its coloring properties, and that the same thing is true as to the meats. Indeed, an examination of the testimony of the witnesses who were questioned upon this subject leaves little room for doubt about this.

But it is manifest that the Spanish paprika has other purposes and other uses than those indicated. It is to a very considerable extent done up in packages which have sifter tops the same as other pepper packages.

The effort to show that there is no pungency to this article fails. It is true that there is less pungency or biting qualities than in other peppers. But the testimony, fairly analyzed, discloses that there is also a marked distinction between the biting qualities of cayenne pepper ground from the small fruited chillies and peppers ground from other capsicums which admittedly produce red pepper, so that the distinction becomes one of degree of pungency as between the present importation and ordinary red pepper.

It is fairly open to inference that the witnesses who by their testimony exclude paprika (Spanish and Hungarian alike) from the peppers commercially known as red peppers, are guided more by their understanding of what constitutes red pepper than by trade terms actually employed. The attempt is made to discriminate between degrees of pungency or the biting taste of paprika and red peppers or cayenne peppers. This is illustrated by the examination of one of the witnesses, thus:

Q. What excludes it from the category of articles which you say your trade recognizes as ground capsicum or red pepper or cayenne pepper?—A. Because it has not the pungency or biting qualities of cayenne pepper.

Q. Is that the general trade understanding according to your experience?—A. Yes, sir.

When it is noted that a large proportion of the red pepper ground from capsicum, admittedly dutiable as capsicum or red pepper, has not the same pungency or biting taste as cayenne pepper, and that some of the dealers do not list red peppers as such at all, the inference is at least justifiable that in the effort to exclude paprika from the classification of red peppers or capsicum the witnesses have set up a standard of quality more exacting than the statute warrants, for the testimony fully establishes that cayenne pepper is made by grinding the pods of small fruited chillies and of cherry capsicums. One importer testified that he imports from 50 to 70 tons of red peppers, of which about 30 tons are capsicums not suitable for cayenne. This product is presumably sold as red pepper. This importer testifies that Hungarian paprika is not sold under the name of red pepper, but that it is red pepper. He undertakes to say that the reason it is not sold as red pepper is because it has not sufficient strength to qualify it as a capsicum or cayenne pepper, and yet it appears that the article is sold with labels of "rosen paprika," meaning in Hungarian, red pepper, and it has also, in the case of one large wholesaler at least, a sublabel "sweet red pepper."

It is also significant that while paprika is listed separately from red pepper when the latter is listed at all, it happens in two of the price lists that have been introduced in evidence that no such commodity as red pepper is listed. Neither is capsicum. On the other hand, other price lists list red pepper and do not list cayenne.

The truth would seem to be that these are all red peppers; that there is no such established commercial use of the term "red pepper" as precludes reference to the common meaning of that term; and that the term "capsicum" or "red pepper" includes all red peppers derived from capsicum, including Hungarian and Spanish paprika, as the names of the latter import.

In so far as the testimony of the witnesses consisted of a comparison of the pungency or biting qualities of cayenne pepper with the importation, it would be of little value, as admittedly there is a red pepper which is less biting than the cayenne pepper.

As was said by the Board of General Appraisers:

The only difference between this case and the one above referred to (the Vandegrift case), as we read the record, is that there is a little more testimony with reference to commercial designation. It is a difference in quantity rather than in quality. The same points are made and the same principle involved.

We agree with the board in holding that the testimony does not show a commercial designation such as is contemplated by the rule that commercial designation shall prevail over the common meaning of the term.

Paprika, it is true, is not sold under the name of red pepper alone. Nor is it very clear that red pepper is very commonly sold under that name. By this we mean red pepper ground from capsicum pods of the larger variety (not chillies). As a matter of fact, pepper ground from chillies is sold as cayenne pepper. The ordinary red pepper ground from larger pods has less pungency. Next in order comes the Hungarian paprika, which is called "rosen paprika," and is also marked "sweet red pepper" on many of the labels. This is handled by the trade, and there seems little question that it is dutiable under this paragraph as red pepper. Then comes the Spanish paprika, which has still less pungency but is not devoid of it, and this is labeled "Spanish paprika," and is admittedly a spice and is red in color and is sold under the name of paprika. It would not, of course, respond to the call for cayenne pepper. Neither would the ground red pepper, so-called, nor would the Hungarian paprika, and yet we think it must be classed within the latter for the reason that all these subjects of importation are in their common name and acceptation red peppers. "Paprika" is the Hungarian word for pepper. It is in fact a capsicum, and the term "capsicum" has not been shown by the testimony to have any other signification than the common meaning of the term. One of the witnesses in the case testified:

Q. How about capsicum, what does that mean in your trade, capsicum or red pepper?—A. Any species of capsicum.

And he further testified that capsicum takes in the entire family.

As before stated, Hungarian paprika has, apparently without question, a pungency, and Dr. Brinton, chemist in charge of the food inspection laboratory at Philadelphia, testified, in the Vandegrift case, that there is practically no difference except a slight difference in flavor and possibly a little in color between the Hungarian paprika and the Spanish pimientoes or paprika; that this difference is no greater than might occur in the same variety of plants grown under different climatic conditions of different places; that both are recognized as the same botanical variety of capsicum; that capsicum includes both of them, but that these two are of the same variety of capsicum. The witness Brandt, in the Vandegrift case, testified that the Hungarian was more pungent than the Spanish.

We intimated in the former decision that to attempt a classification based upon degree of pungency when the commodity possessed that quality at all would be to invite confusion and uncertainty, and we should hesitate to place such an interpretation upon the statute except upon clear proof.

We think in the present case there is not such a showing, at the most, as would justify us in overruling the conclusion reached by the board. The decision will stand *affirmed.*